UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| **BRIAN LEE SCHMITZ**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**EQUIFAX INFORMATION SERVICES, LLC**<br>SERVE: Corporation Service Company, Reg. Agent<br>33 East Main Street, Suite 610<br>Madison, WI 53703<br>and<br><br>**WAYPOINT RESOURCE GROUP LLC**<br>SERVE: Cogency Global Inc., Reg. Agent<br>100 Wilburn Rd., Suite 100<br>Sun Prairie, WI 53590<br><br>**Defendants.** | ) | **Civil Action No.:** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, Brian Lee Schmitz, by counsel, and for his Complaint against Defendants Equifax Information Services, LLC ("Equifax") and Waypoint Resource Group, LLC ("Waypoint"), he states as follows:

**PRELIMINARY STATEMENT**

1. This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA") and the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA").

2. Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs", whereas Equifax is referred to as the "CRA Defendant").

3. The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act and the Fair Housing Act.

4. Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination,'" as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights."

5. Not only do inaccurate consumer reports lead to discrimination against consumers, but they also make it more difficult for banks and other finance companies to efficiently extend offers of credit to qualified individuals. The most obvious example occurs when a consumer applies for credit, is subsequently denied due to inaccurate information on their report, and the lender loses what would have been a potential customer. The inaccuracies not only harm the consumer, but they also deny the potential lender an opportunity to assess that consumer's creditworthiness accurately.

6. In addition to relying on consumer reports to evaluate direct credit applications, many companies use CRAs to "prescreen" consumers' eligibility for particular offers.

> In prescreening, a creditor or insurer establishes a set of specific credit criteria (such as a minimum credit score) and requests from a CRA the names, addresses, and certain other information on consumers in the CRA's database who meet the specified criteria. Alternatively, the creditor or insurer may provide a list of potential customers to the CRA and request that the CRA identify which consumers on that list meet the established credit criteria.

BD. OF GOVERNORS OF THE FED. RESERVE SYS., *Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance*, 7 (2004), Available at https://www.federalreserve.gov/boarddocs/rptcongress/UnsolicitedCreditOffers2004.pdf.

7. If there is inaccurate information on a consumer's report, the CRA and lender may wrongfully exclude that consumer from certain "prescreened" offers. In this situation, the inaccuracies both preclude the individual consumer from receiving the credit offers and impede the lender's ability to use prescreening as a tool for "market efficiencies and better control of risks" *See, e.g., id*. at 10.

8. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

9. The FCRA's accuracy provision demands that CRAs like Equifax take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from their creditor-customers (like Waypoint), particularly when a consumer makes a dispute about information reported.

10. Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, that entity

is Waypoint (the "Furnisher" or "Waypoint"). The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

11. Plaintiff brings claims under Section 1681e(b) against Equifax because it reported inaccurate account information about Plaintiff regarding the fraudulent account with Waypoint. When Plaintiff disputed the inaccuracies, Equifax did not reasonably investigate, also violating Section 1681i.

12. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax has complied with its now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax has been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had Equifax followed that advice and heeded those warnings, Plaintiff would not have been harmed.

13. Likewise, Waypoint violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from Equifax and failed to reasonably investigate those disputes. Instead, discovery will show all Waypoint did was consult its own records regarding the account at issue and confirm to the agencies the inaccurate information it was already reporting. Waypoint failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice that Plaintiff is a victim of identity theft.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and

15 U.S.C. § 1692k(d).

15. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) & (2). Plaintiff resides in this District, and all Defendants are residents of Wisconsin State. Additionally, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Division.

## PARTIES

16. Plaintiff is a natural person residing in Fond du Lac County, Wisconsin, and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c) and 15 U.S.C. § 1692a(3).

17. Equifax is a foreign corporation authorized to do business in the State of Wisconsin through its registered agent in Madison, Wisconsin.

18. Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

19. Equifax disburses consumer reports to third parties under contract for monetary compensation.

20. Defendant Waypoint is a "furnisher" of information as governed by 15 USC § 1681s-2.

21. Waypoint is a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6). Specifically, Waypoint uses instrumentalities of interstate commerce or the mails in its business, the principal purpose of which is the collection of debts. Waypoint regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

No exception to the term "debt collector" applies to exempt Waypoint from regulation under the FDCPA.

## FACTUAL ALLEGATIONS

### *Section 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRAs' Creditor-Customers*

22. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

23. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

24. Well over a decade ago, the Third Circuit apprised non-party CRA Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC*, 617 F.3d 688, 709-10 (3d Cir. 2010).

25. Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

26. Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

27. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

28. It has long been the law that a CRA, such as Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g., Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

29. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

30. As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

31. Further, as Equifax is aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Equifax has a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

32. It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

***Section 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as Waypoint to Perform a Detailed and Systematic Investigation of a Consumer's Dispute***

33. Today, furnishers such as Waypoint have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties on furnishers were enacted thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

34. Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

35. "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

357 F.3d 426, 430 (4th Cir. 2004).

*36.* Waypoint was aware of this duty to Plaintiff, and despite this awareness, it chose to ignore its responsibilities under the FCRA.

***Plaintiff Discovers Equifax was Reporting Inaccurate Information Regarding a Fraudulent Account and Disputes Those Inaccuracies***

37. Plaintiff is a victim of identity theft.

38. On or around April 19, 2026, Plaintiff was notified by his credit monitoring service that a collection was reporting on his credit reports. Plaintiff discovered that Equifax was reporting an inaccurate and derogatory collection account on his credit with a balance of $148. The underlying debt was a fraudulent account with Spectrum Mobile, and collection agency was Waypoint (the "Fraudulent Waypoint Account"). In addition, Plaintiff discovered a Texas address associated with the Fraudulent Waypoint Account reporting on his Equifax credit report. Plaintiff has never lived in Texas.

39. The information on Plaintiff's credit report was inaccurate. Plaintiff did not open an account with Spectrum Mobile, he did not authorize anyone to open the fraudulent account on his behalf, and he did not benefit from the fraudulent account in any way. Waypoint had no right to collect the fraudulent account debt from Plaintiff.

40. On or around April 20, 2026, Plaintiff called Waypoint regarding the Fraudulent Waypoint Account. The Waypoint representative told Plaintiff that the collection was for a Spectrum Mobile account that was opened in Texas. The Waypoint representative told Plaintiff that Plaintiff would have to obtain a letter from Spectrum Mobile and provide it to Waypoint in order for Waypoint to remove the Fraudulent Waypoint Account from Plaintiff's credit reports.

41. On or around April 20, 2026, Plaintiff contacted Spectrum Mobile regarding the Fraudulent Waypoint Account. Plaintiff told the Spectrum Mobile representative that he was a

victim of identity theft, he never lived in Texas, and he did not open or authorize an account in his name with Spectrum Mobile. The Spectrum Mobile representative told the Plaintiff that the account had already been marked as fraudulent. The representative stated that it would provide Plaintiff with a letter confirming that the account was fraudulently opened and that it had requested Waypoint cease collection activities.

42. On April 23, 2026, Plaintiff submitted a complaint against Waypoint with the Consumer Financial Protection Bureau. In that complaint, Plaintiff explained that he was a victim of identity theft and that Waypoint was attempting to collect the Fraudulent Waypoint Account from him.

43. On April 24, 2026, Plaintiff submitted an FTC Identity Theft Report regarding the identity theft and Fraudulent Waypoint Account.

44. On April 25, 2026, Plaintiff sent a properly addressed letter via certified mail with sufficient postage to Equifax informing it that he was a victim of identity theft and that the Waypoint account was the result of identity theft. Plaintiff requested that Equifax remove the Fraudulent Waypoint Account from his credit file. Plaintiff included proof of identity and a copy of his FTC identity theft report with this dispute to Equifax.

45. On April 28, 2026, Equifax received Plaintiff's dispute letter (USPS certified mail tracking number 9589 0710 5270 3809 5437 06).

46. On or around April 28, 2026, Plaintiff received a letter from Spectrum Mobile confirming the account had been opened fraudulently and that a request had been sent to Waypoint to cease collection efforts and cease the reporting of the Waypoint account.

47. On April 30, 2026, Plaintiff received a letter from Equifax in response to his April 2026 dispute. In that letter, Equifax stated that it had was "unable" to remove the information from Plaintiff's credit report and that it needed additional documentation.

48. On May 4, 2026, Plaintiff submitted an online dispute with Equifax stating that the Waypoint account was the result of identity theft. Plaintiff attached his FTC identity theft report and the letter from Spectrum Mobile confirming that the account had been fraudulently opened and that Waypoint had been instructed to cease reporting the Waypoint account.

49. On or around May 4, 2026, Plaintiff sent another properly addressed letter via certified mail with sufficient postage to Equifax informing it that the Waypoint account was the result of identity theft. Plaintiff requested that the fraudulent Waypoint account be removed from his credit file. Plaintiff included proof of identity, a copy of his FTC identity theft report and the letter from Spectrum Mobile confirming the account had been opened fraudulently. Upon information and belief, Equifax received Plaintiff's May 2026 certified mail dispute.

50. On May 4, 2026, Plaintiff submitted a complaint to the CFPB against Equifax stating that the fraudulent Waypoint account was reporting on his Equifax credit report and that Equifax had refused to remove the fraudulent items from his credit report. Plaintiff attached the letter that he received from Spectrum Mobile confirming that the account was fraudulently opened and FTC Identity Theft affidavit with this complaint to the CFPB.

51. On May 7, 2026, Waypoint responded to Plaintiff's CFPB complaint stating that the fraudulent Waypoint account was showing paid in full and that it had withdrawn its credit reporting of the Waypoint account.

52. On May 7, 2026, Plaintiff received another response to his dispute from Equifax stating that it had had concluded its investigation and that it had determined that the fraudulent Waypoint account belonged to Plaintiff.

53. On May 10, 2026, Equifax responded to Plaintiff's CFPB complaint stating that it was unable to process an identity theft block because it needed additional documentation.

54. On May 19, 2026, Plaintiff received another response to his online Equifax dispute. In that response, Equifax told Plaintiff that it was unable to remove the fraudulent account from Plaintiff's credit report and needed more documentation in order to process an identity theft block.

55. On June 1, 2026, Plaintiff accessed his credit reports again, and to Plaintiff's dismay, found that Equifax was still reporting the Fraudulent Waypoint Account. Specifically, Equifax was reporting the Fraudulent Waypoint Account on Plaintiff's credit as "in collections" with a past due balance of $148.00. In addition, Equifax was still reporting the Texas address associated with the fraudulent Waypoint account on Plaintiff's credit report.

56. On July 27, 2026, Plaintiff filed a police report with the Fon du Lac Police Department regarding the identity theft and the Fraudulent Waypoint Account.

57. On July 30, 2026, Plaintiff sent another properly addressed letter via certified mail with sufficient postage to Equifax informing it that the Waypoint account was the result of identity theft. Plaintiff requested that Equifax remove the Fraudulent Waypoint Account and the Texas address associated with the Fraudulent Waypoint Account. Plaintiff included proof of identity, copies of his FTC identity theft report, and the Fon du Lac Police department report with this dispute to Equifax.

58. On August 2, 2026, Equifax received Plaintiff's dispute letter (USPS certified mail tracking number 9407-1118-9876-15595-2659-83).

59. On or around August 5, 2026, Plaintiff received a response to his dispute from Equifax stating that it needed proof of identity and address in order to process Plaintiff's dispute. In its response, Equifax stated acceptable forms of proof of identity and address included a copy of Plaintiff's driver's license and W-2 form –both of which Plaintiff had included in his July 2026 dispute to Equifax.

60. On August 7, 2026, Plaintiff received another response letter from Equifax stating that it had completed its investigation and that it had determined that the fraudulent Waypoint collection account belonged to Plaintiff.

61. Plaintiff never received a notification from Equifax that an identity theft block was processed or declined in response to Plaintiff's July 2026 dispute and identity theft notification.

62. On August 12, 2026, Plaintiff accessed his credit reports again, and to Plaintiff's dismay, found that Equifax was still reporting the derogatory and Fraudulent Waypoint Account on his credit as "in collections" with a past due balance of $148.00. In addition, Equifax was still reporting the Texas address associated with the Fraudulent Waypoint Account on Plaintiff's credit report.

63. On August 15, 2026, Plaintiff accessed his credit reports again, and to Plaintiff's dismay, found that Equifax's reporting of the Fraudulent Waypoint Account and the Texas address associated with the Fraudulent Waypoint Account had not changed.

64. On September 8, 2026, Plaintiff accessed his credit reports again, and found that the fraudulent Waypoint account was finally removed from Plaintiff's Equifax credit report. However, Equifax was still inaccurately reporting the address associated with the Fraudulent Waypoint Account as belonging to Plaintiff.

65. On September 14, 2026, Plaintiff accessed his credit reports again, and to Plaintiff's dismay, found that Equifax had still not removed the Texas address associated with the fraudulent Waypoint account from his credit report.

66. Upon information and belief, Equifax failed to evaluate or consider any of Plaintiff's information, claims, or evidence, and did not make sufficient—if any—attempts to remove the disputed and fraudulent items within a reasonable time following Defendants' receipt of Plaintiff's disputes.

67. Plaintiff has taken numerous steps to combat the false reporting that has resulted from the theft of his identity, including submitting the below Police and Identity Theft Reports:

- April 23, 2026: Submitted a Federal Trade Commission ("FTC") Consumer Report regarding the Fraudulent Waypoint Account.
- April 24, 2026: Submitted an FTC Identity Theft Report regarding the Fraudulent Waypoint Account.
- May 4, 2026: Submitted another FTC Consumer Report regarding the Fraudulent Waypoint Account
- July 27, 2026: Filed a report with the Fond du Lac Police Department regarding the Fraudulent Waypoint Account.

68. Despite Plaintiff's efforts, and despite providing the FTC Identity Theft Report and police report to Defendants, Plaintiff is still burdened by the fraudulent information that Defendants continue reporting on his credit.

69. Further, prior to reporting the collection of the fraudulent Waypoint collection account to the credit reporting agencies, Defendant Waypoint failed to notify Plaintiff of the possible reporting under Regulation F. 12 CRF part 1006. Rather, Waypoint "parked" the adverse information on Plaintiff's credit reports without providing advanced notice in an attempt to collect on the false and Fraudulent Waypoint Account.

70. Upon information and belief, Equifax is continuing to inaccurately report inaccurate and fraudulent information as belonging to Plaintiff.

### *Equifax Did Not and Does Not Conduct Any Investigation of Most Consumer Disputes*

71. Unknown to Plaintiff until recently, it has long been the practice of the CRAs to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax uses a vendor which was previously known as Intelenet Global Services and is now known as Teleperformance.

72. Here is how the written mail dispute process actually works for Equifax: a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication. That mailbox company receives consumer disputes, scans them into a batch with other disputes, and sends those batches to Teleperformance.

73. Teleperformance uses low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

74. Teleperformance agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

75. The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

76. In fact, Equifax strongly encourages consumers to make disputes through its online website. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax. The dispute is sent to Equifax's creditor customers (such as Waypoint) for their sole review and consideration.

77. Equifax has taken the position in other litigation that it has no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

78. Regardless of whether these statements by Equifax are correct, Equifax believes that it cannot direct, control, manage or reliably influence the employees of its third-party outsource vendor.

79. Equifax itself did not conduct any reinvestigation of Plaintiff's disputes. Instead, it merely caused the disputes to be removed from its control to be saved within a database by an overseas data-processing vendor.

***Equifax Forwarded Plaintiff's Disputes to Waypoint, Which Did Nothing***

80. In each instance in which Plaintiff disputed the Waypoint account with Equifax, Equifax forwarded Plaintiff's disputes to Waypoint using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are electronically communicated back to CRAs.

81. On information and belief, e-Oscar is also the system by which Waypoint has agreed it will accept consumer disputes from the CRAs.

82. Each time Waypoint received one of Plaintiff's disputes from Equifax, Waypoint became obligated under the FCRA to investigate that dispute.

83. Plaintiff's disputes to Waypoint to attempt to have it investigate his complaints went unanswered.

84. Waypoint failed to investigate Plaintiff's complaints.

85. Despite Plaintiff providing Waypoint with ample notice that he is a victim of identity theft and he does not owe any amount associated with the fraudulent account, Waypoint continued to wrongfully report the derogatory information as "accurate" to Equifax. Discovery will show that all Waypoint did when supposedly investigating Plaintiff's disputes from Equifax was consult its own internal account records and simply report back to Equifax the same inaccurate information Plaintiff was disputing.

86. On dates better known to Equifax and Waypoint, Equifax furnished Plaintiff's disputes to Waypoint.

87. Equifax responded to Plaintiff's disputes, claiming the information was accurate. These responses confirm that the Equifax communicated Plaintiff's disputes to Waypoint.

88. Upon information and belief, Equifax timely notified Waypoint of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

89. Alternatively, Equifax failed to notify Waypoint of Plaintiff's disputes, and/or failed to provide the supporting documents submitted with Plaintiff's disputes.

90. By its actions as described herein, Waypoint furnished and communicated false credit information regarding Plaintiff.

***Plaintiff Suffered Actual Harm***

91. Defendants continued to report the derogatory Waypoint account information on Plaintiff's credit reports, even after being notified repeatedly that this information is false. Upon information and belief, Defendants are *still* reporting inaccurate information on Plaintiff's credit files.

92. As a result of the inaccurate credit reporting and refusal to correct Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

a. Harm to his credit scores and credit opportunities;

b. Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

c. Loss of time attempting to correct the inaccuracies;

d. Stress associated with attempting to resolve this matter;

e. Loss of privacy;

f. Harm to reputation; and

g. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

***Defendants' Conduct was Willful***

93. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co.*

*of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

94. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

95. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Equifax's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

96. Equifax has received numerous disputes and other complaints regarding Waypoint—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

97. Since 2018, in federal court alone, Waypoint has been sued over ninety times by consumers alleging violations of the Fair Credit Reporting Act.

98. In many of these FCRA lawsuits brought by a consumer, Equifax was named co-defendants.

99. Equifax knew or should have known of this litigation history.

100. Equifax uses and has access to PACER to investigate and monitor consumer complaints.

101. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many

multiples more are made directly to Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

102. Each Defendant regularly receives unredacted consumer dispute details from this database.

103. Since the database began accepting complaints, the CFPB has sent millions of consumer credit reporting complaints to Equifax and thousands of complaints to Waypoint.

104. Further, more than 390,000 complaints regarding Equifax were based largely on its respective failures to reasonably investigate consumer disputes.

105. Just in the last 12 months alone, Equifax has been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that Equifax violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

106. While the thousands of consumer complaints and millions of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed Equifax on notice that it may not merely "parrot" what its creditor-customer tells it if the consumer had provided a substantive and detailed dispute.

107. Equifax has had actual notice from numerous other courts that its blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does

not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

108. Defendant Equifax has even been warned by a District Court in its home state of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005). Equifax is aware of this warning.

109. Equifax has long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was

a case regarding fellow-CRA Trans Union from almost 30 years ago. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

110. Equifax has also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

111. In 2015, a large group of state Attorneys General forced a consent order from the CRAs, including Equifax, by which they were required to develop procedures necessary to comply with the FCRA.[2] The AG Settlement required, amongst many changes and mandates, that the CRAs comply with § 1681i(a).

112. The AG Settlement also required the CRAs to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, Equifax did not meaningfully comply with the AG Settlement in these regards.

113. Equifax is also aware of substantive and detailed criticism by public interest groups about its automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer

[2] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

114. The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

115. Among many of the CRAs' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

[3] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

116. Proportionately similar to the CRAs' complaint history, Waypoint has been sued in federal court over ninety times in the last decade for alleged consumer credit violations.

117. Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe that it would cost too much money to do so.

118. Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b) *against Equifax*

119. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

120. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff when it reported the inaccurate and fraudulent account information from Defendant Waypoint.

121. Equifax has plenty of resources to maintain (and follow) reasonable procedures, yet it chooses not to do so because of how those procedures might impact its bottom line. One common example of Equifax's failures to follow the reasonable procedures required by Section 1681e(b)

relates to how it blatantly ignores “red flags” in identity theft situations, particularly with regard to the addresses associated with accounts.

122. Equifax receives consumer data from banks, credit card companies, mortgage servicers, utility companies, and other “furnishers”. Equifax uses personally identifiable information (“PII”) such as names, social security numbers, dates of birth, and addresses to match incoming data to a particular person’s file.

123. Equifax chooses how closely the PII provided by a furnisher must match a consumer’s PII before it will include the furnished information in that consumer’s file. In addition to the furnished name, social security number, and date of birth, the address associated with an account is one of the key items of information that CRAs can use to properly associate an account with an individual. Although certain PII (such as a consumer’s date of birth) should never change, it is common (and expected) for a consumer to update their address with their bank and credit card companies when moving to a new address.

124. In Plaintiff’s situation, as is commonly the case with identity theft, the Spectrum Mobile account underlying the Waypoint collection account was tied to an address that had no association with Plaintiff. While all the furnishers reporting legitimate accounts on Plaintiff’s credit continued to provide Equifax with an address in Wisconsin where Plaintiff has lived for years, the address that Defendant Waypoint provided to Equifax had no connection to Plaintiff whatsoever.

125. The Spectrum Mobile account was tied to an address in Austin Texas. Plaintiff has never lived in Texas, Plaintiff has never worked in Texas, and Plaintiff has never had an account with Spectrum Mobile.

126. Equifax recognizes the sudden appearance of a new address as a red flag for fraud. In fact, Equifax licenses credit monitoring API to businesses, which alert their customers regarding address changes:

> Examples of events that may trigger an alert: New Inquiry, Address Change, Name Change (Equifax only), New Collection, Existing Collection Change, New Account, Existing Account Change, New Bankruptcy, Existing Bankruptcy Change.

127. Despite Equifax recognizing address "changes" as red flags for fraud, and despite Plaintiff having no association whatsoever with the Texas address tied to the Spectrum Mobile account, and despite all the other furnishers continuing to report Plaintiff's correct address to Equifax, Equifax nevertheless followed procedures which ignored the anomalous address and chose to report the Waypoint collection account as belonging to Plaintiff.

128. As a result of Equifax's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: harm to his credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

129. Further, after Plaintiff's disputes put it on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of its creditor-customer, Equifax ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

130. The violations by Equifax were willful, rendering Equifax liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

131. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
***Against Equifax***

132. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

133. Equifax violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the items from Plaintiff's credit file.

134. Equifax violated 15 U.S.C. § 1681i(a)(2) by its conduct which includes, but is not limited to, failing to send to Waypoint all relevant information that it received with Plaintiff's disputes.

135. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Waypoint account.

136. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

137. After receiving Plaintiff's April 2026 dispute letters, Equifax violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

138. As a result of Equifax's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: harm to his credit scores and credit opportunities; costs

associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

139. The violations by Equifax were willful, rendering Equifax liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

140. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT III:
## VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681c-2
***against Equifax***

141. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

142. Pursuant to 15 U.S.C. § 1681c-2(a) a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of (1) appropriate proof of the identity of the consumer; (2) a copy of an identity theft report; (3) the identification of such information by the consumer; and (4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

143. Pursuant to 15 U.S.C. § 1681c-2(b) A consumer reporting agency shall promptly notify the furnisher of information identified by the consumer under subsection (1) that the information may be a result of identity theft; (2) that an identity theft report has been filed; (3) that a block has been requested under this section; and (4) of the effective dates of the block.

144. Here, Plaintiff sent multiple dispute letters to Equifax explaining that the Waypoint account was the result of his identity being stolen. With these letters, he included proof of identity, a copy of the Police Report he filed, and a copy of the FTC Identity Theft Report he filed.

145. Equifax continued to report the fraudulent information on Plaintiff's credit files.

146. Equifax violated 15 U.S.C. § 1681c-2(a) by its conduct, acts, and omissions in failing to block the reporting of information in Plaintiff's consumer file regarding the fraudulent transactions after receiving actual notice of the identity theft with supporting documentation.

147. Equifax violated multiple sections of 15 U.S.C. § 1681c-2 by its acts and omissions, including, but not limited to, the following:

a. failing to block the reporting of information in Plaintiff's consumer credit file within 4 business days after receiving notice that the fraudulent transactions were the result of Plaintiff's identity being stolen in violation of § 1681c-2(a);

b. failing to promptly notify Waypoint that the information in Plaintiff's consumer credit file may be the result of identity theft in violation of § 1681c-2(b)(1);

c. failing to promptly notify Waypoint that an identity report has been filed regarding the fraudulent accounts in violation of § 1681c-2(b)(2);

d. failing to promptly notify Waypoint that a block on Plaintiff's credit file had been requested and the effective dates of said block in violation of § 1681c-2(b)(3) and (4); and

e. failing to promptly notify the Plaintiff that a block of the Waypoint account had been declined or rescinded in violation of § 1681c-2(c)(2).

167. As a result of Equifax's violations of 15 U.S.C. § 1681c-2, Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information; harm to credit; loss of credit opportunities; loss of privacy; and mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

168. These violations of § 1681c-2 were willful, rendering Equifax liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

169. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT IV**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(A) & (B)**
***against Waypoint***

170. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

171. Waypoint violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after his disputes were furnished directly to it by Equifax.

172. Waypoint violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax forwarded Plaintiff's disputes to it.

173. As a result of Waypoint's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: harm to his credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

174. The violations by Waypoint were willful, rendering Waypoint liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Waypoint was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

175. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Waypoint in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(C) & (D)**
***against Waypoint***

176. Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

177. On one or more occasions within the past two years, by example only and without limitation, Waypoint violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit file with Equifax in response to his disputes without also including an accurate notation that the debt was disputed and by failing to correctly report results of an accurate investigation to Equifax.

178. On information and belief, Plaintiff alleges that Waypoint rarely—if ever—adds the correct notation indicating that the account is disputed when it responds to the e-Oscar ACDVs.

179. Plaintiff's disputes were, at minimum, bona fide.

180. As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to: harm to his credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

181. Waypoint was aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

182. On information and belief, Plaintiff alleges that the procedures followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that Waypoint intended its

employees or agents to follow.

183. On information and belief, Plaintiff alleges that Waypoint's employees or agents did not make a mistake in the way they followed Waypoint's procedures when they received, processed and responded to the ACDVs from Equifax and did not include a proper notation regarding the account being in dispute.

184. On information and belief, Plaintiff alleges that Waypoint has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

185. The violations by Waypoint were willful, rendering Waypoint liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Waypoint was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

186. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Waypoint in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT VI
## VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(E)
***against Waypoint***

187. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

188. Waypoint violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from Equifax and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Waypoint's failures to investigate as articulated herein, after receiving notice of Plaintiff's disputes from Equifax.

189. As a result of this conduct (the action and inaction of Waypoint), Plaintiff suffered actual damages, including but not limited to: harm to his credit scores and credit opportunities; costs associated with disputing the inaccurate information, mental and physical stress and aggravation; harm to reputation; and loss of privacy.

190. The violations by Waypoint were willful, rendering Waypoint liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Waypoint was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

191. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Waypoint in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT VII:**
**VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT**
**15 U.S.C. § 1692d & 12 C.F.R. § 1006.30(a) of Regulation F**
***Against Waypoint***

192. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

193. Waypoint violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692d, by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

194. Waypoint began reporting on Plaintiff's credit before (i) speaking to Plaintiff about the debt in person or by telephone, or (ii) placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

195. The natural consequence of Waypoint's actions was to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

196. As a result of this conduct (the action and inaction of Waypoint), Plaintiff suffered actual damages, including but not limited to: harm to his credit scores and credit opportunities; credit card denial, costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

197. Plaintiff is entitled to actual and statutory damages against Waypoint, as well as reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT VIII:**
**VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT**
**15 U.S.C. § 1692f & 12 C.F.R. § 1006.30(a) of Regulation F**
***against Waypoint***

198. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

199. Waypoint violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692f, by using unfair or unconscionable means to collect or attempt to collect a debt.

200. Waypoint began reporting on Plaintiff's credit before (i) speaking to Plaintiff about the debt in person or by telephone, or (ii) placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

201. It was unfair, unconscionable, and in violation of the FDCPA for Waypoint to "park" the debt on Plaintiff's credit without first contacting him.

202. As a result of this conduct (the action and inaction of Waypoint), Plaintiff suffered actual damages, including but not limited to: harm to his credit scores and credit opportunities; credit card denial; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

203. Plaintiff is entitled to actual and statutory damages against Waypoint as well as reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

**DEMAND FOR RELIEF**

Plaintiff therefore respectfully requests that this Court:

(1) Award Plaintiff actual and punitive damages for violations of the Fair Credit Reporting Act by Equifax, and Waypoint;

(2) Award Plaintiff attorney's fees and costs under the Fair Credit Reporting Act;

(3) Award Plaintiff actual and statutory damages against Waypoint due to its violations of the Fair Debt Collection Practices Act;

(4) Award Plaintiff reasonable attorney's fees and costs against Waypoint under the Fair Debt Collection Practices Act

(5) Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(6) Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

Dated: October 6, 2026

Respectfully submitted,

**BRIAN LEE SCHMITZ**

By:

/s/ *James M. Smith*
Richard J. Doherty Atty ID No. 6226707
James M. Smith, Atty ID No. 6285183
Doherty Smith, LLC
7000 W. 127th Street
Palos Heights, IL 60462
Phone: 312-319-2879
JSmith@dohertysmith.com

Leonard Bennett, Atty ID No. 37523
**Consumer Litigation Associates, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Fax
Email: lenbennett@clalegal.com

*Counsel for Plaintiff*